IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID PAUL FARRAR,<br><br>Defendant. | CR 20–05–M–DLC<br><br><br><br>ORDER |

Before the Court is Defendant David Paul Farrar's Motion to Suppress Evidence. (Doc. 29.) This motion accompanies Farrar's contemporaneously filed motion to compel, which the Court denied. (*See* Docs. 31; 32; 41.) In both motions, Farrar seeks to support his theory that a central prosecution witness, L.S., acted as a state agent when she discovered an SD card containing an incriminating video in his bedroom.

Farrar urges the Court to suppress the evidence seized as a result of L.S.'s purportedly warrantless search of his bedroom. (Doc. 30 at 2.) The Court held a hearing on June 17, 2020. After considering the parties' briefs, supporting exhibits, and the evidence presented at the hearing, the Court denies Farrar's motion.

- 1 -

## BACKGROUND

Although the evidence presented at the hearing left the Court's previous iteration of the factual background largely unchanged (*see* Doc. 41), the Court will nevertheless summarize the operative facts again to put the ruling here into context.

On August 7, 2019, Sanders County Deputy Sheriff Roy Scott received a call from "someone"[1] stating that L.S. needed to talk with him about a discovery she made in Farrar's home. (Doc. 33-1 at 1.) Three days later, Deputy Scott spoke to L.S. at Farrar's residence at 105 East Meany (the "East Meany house") in Plains, Montana—a home that Farrar rented and where L.S. stayed with Farrar's permission while he was in custody in Idaho. (*Id.*) L.S. informed Deputy Scott that, while "cleaning up and taking care of the home," she found several digital storage devices, including an SD card containing a sexually explicit video of a child. (*Id.*) Deputy Scott asked L.S. to provide him with a statement and to hold onto the SD card and other digital storage devices in the bedroom until he could contact an outside investigative agency. (*Id.*)

---

[1] In his brief, Farrar represents that L.S. made the initial call to Deputy Scott. (Doc. 30 at 2, 3.) However, at the hearing, Deputy Scott testified that another woman, J.T., made the August 7, 2019 phone call. L.S., too, confirmed at the hearing that J.T. made the call at L.S.'s request. L.S. explained that she asked J.T. to call the Sheriff's Deputy because she, L.S., "didn't always have service on [her] phone, and she [J.T.] did, so it was a much quicker route than [L.S.] going to try and find wifi."

Ultimately, Deputy Scott called Homeland Security Investigations ("HSI") in the Department of Homeland Security for assistance. (*Id.*) HSI Special Agents Holly Langley and Richard McManaway, together with Deputy Scott and Sanders County Detective Brian Josephson, interviewed L.S. on August 23, 2019. (Doc. 33-2 at 1.) L.S. said that she had been looking for "some pictures of hers [Farrar] was supposed to have downloaded for her to an SD card" when she discovered the video that led her to initiate contact with Deputy Scott. (*Id.*)

L.S. explained that she found several SD cards in a safe in Farrar's bedroom closet. (*Id.* at 1, 5.) L.S. claimed she had access to the safe because it contained her belongings, too. (*Id.*) The SD cards were stored together in a small, light green coin pouch. (*Id.* at 5.) L.S. said she "was removing SD cards [from the pouch] and putting them in and out of her phone" to find the one that contained her own photos when she came across the video of the child. (Doc. 33-2 at 5.) L.S. stated that she "un-mounted" the SD card from her phone and put everything together in a box in the bedroom. (*Id.*) The interview with HSI concluded with a renewed instruction to L.S. to leave the electronics and storage devices in Farrar's bedroom. (*Id.* at 7.)

Based primarily on the information L.S. provided to law enforcement, HSI obtained a search warrant for the East Meany house, which it executed on August 29, 2019. (*Id.* at 10; Doc. 34-1.) During the search, HSI agents previewed and

- 3 -

seized the SD cards described by L.S. from Farrar's bedroom. (Docs. 30 at 10; 30-2 at 1.)

On January 9, 2020, Farrar was charged by complaint with Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(b). (Doc. 1.) A Grand Jury proceeding followed, resulting in the issuance of an indictment charging three counts of Sexual Exploitation of Child, thirteen counts of Transportation of Child Pornography, and one count of Possession of Child Pornography. (Doc. 11.) Now, Farrar moves to suppress the "items of evidentiary value relative to this federal prosecution," positing that L.S. acted as a state agent searching without a warrant when she discovered the SD cards in the coin pouch. (Docs. 29; 30 at 10.)

## DISCUSSION

As Farrar identifies, the question is whether L.S. acted privately or as an instrument of the state when she searched the safe in his bedroom at the East Meaney house.[2] (*See* Doc. 30 at 3.) If the Court finds that L.S. acted as an instrument of the state, Farrar's theory goes, then it must conclude that her

---

[2] Farrar specifically states in his brief that "[c]onsent and satellite issues like apparent authority" do not form the basis for his motion to suppress. (Doc. 30 at 13.) He confirmed at the hearing that "consent and authorization are kind of a tangent here that we need not go down."

- 4 -

warrantless search rendered the seized SD cards the fruit of an unconstitutional search and suppress them.

I.  **Legal Standard**

In relevant part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment's "basic purpose . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Mun. Court of City and Cty. of San Francisco*, 387 U.S. 523, 528 (1967)). To that end, "searches . . . inside a home without a warrant are presumptively unreasonable." *Ky. v. King*, 563 U.S. 452, 460 (2011) (citation and internal quotation marks omitted).

The exclusionary rule enforces the right against unreasonable searches by "bar[ring] the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 232 (2011). The rule "encompasses both the primary evidence obtained as a direct result of an illegal search . . . and . . . evidence later discovered and found to be derivative of an illegality, the so-called [']fruit of the poisonous tree[']." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (internal quotation marks and citations omitted). The potential breadth of the exclusionary rule's application aside, Supreme Court

emphasizes its role as a "deterrent sanction," *Davis*, 564 U.S. at 231–32, and that "suppression of evidence . . . has always been our last resort, not our first impulse," *Strieff*, 136 S. Ct. at 2061 (citation omitted). In other words, because the rule's "sole purpose . . . is to deter future Fourth Amendment violations," exclusion is "clearly . . . unwarranted" where suppression fails to yield "appreciable deterrence." *Davis*, 564 U.S. at 236–37 (citations omitted).

On a motion to suppress evidence under the exclusionary rule, a defendant bears the burden of proving a Fourth Amendment violation by a preponderance of the evidence. *See United States v. Cayman*, 404 F.3d 1196, 1199 (9th Cir. 2005); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (citing *Lego v. Twomey*, 404 U.S. 477, 488–89 (1972)). Relevant here, where a private party conducted the purportedly unconstitutional search, "[t]he defendant has the burden of establishing government involvement in [the] private search." *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994).

## II. Analysis

Farrar argues that the SD cards seized from his bedroom by HSI agents executing the August 29, 2019 warrant should be suppressed. He contends that the warrant was based on evidence found during a warrantless search by L.S. acting in conjunction with Sanders County law enforcement.

As already set out, the Fourth Amendment protects against unreasonable searches, *King*, 563 U.S. at 460, but "proscrib[es] only governmental action; it is wholly inapplicable 'to a search . . . , even an unreasonable one, effected by a private individual not acting as an agent of the [g]overnment or with the participation or knowledge of any governmental official," *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (citation omitted). However, "[w]here a private party acts as an 'instrument or agent' of the state in effecting a search . . . , the Fourth Amendment is implicated." *Cleaveland*, 38 F.3d at 1093 (quoting *Coolidge v. N.H.*, 403 U.S. 443, 487 (1971)).

Courts in the Ninth Circuit conduct a two-pronged inquiry to determine whether a private party's search implicates the Fourth Amendment. *Cleaveland*, 38 F.3d at 1093. First, as described above, the court must ask if "the government knew of and acquiesced in the intrusive conduct." *Id.* (citation omitted). Second, the court must decide "whether the party performing the search intended to assist law enforcement efforts or further [her] own ends." *Id.* (citation omitted). A determination that the government had no knowledge and did not acquiesce in the search is dispositive: a private person "cannot act unilaterally as an agent or instrument of the state; there must be some degree of governmental knowledge and acquiescence." *United States v. Sherwin*, 539 F.2d 1, 6 (9th Cir. 1976). Absent "official involvement, a search is not governmental." *Id.*

At the hearing, Farrar conceded that L.S.'s search was not necessarily directed by the government, but argued that the Court should nevertheless find that it was involved. Farrar contends that, as in *Lustig v. United States*,[3] the government became involved before L.S. completed the search, thereby implicating the Fourth Amendment. *Lustig*, however, was decided on distinguishable facts and outdated law.

There, operating under the since-abrogated *Byars* doctrine,[4] the Supreme Court examined the degree to which a federal agent participated in an illegal search initiated by state authorities. *See generally, Lustig*, 338 U.S. 74. The federal agent did not participate when the local police entered Lustig's hotel room and "proceeded to empty [] bags and the drawers of a bureau and thus came upon the evidence [of counterfeiting] sought to be suppressed." *Id.* at 76–77. However, when he learned what local law enforcement found, the federal agent "came to the hotel and examined the evidence in controversy." *Id.* And, when Lustig returned to the hotel room with the search in progress, the federal agent examined items as

---

[3] 338 U.S. 74 (1949).
[4] *See Byars v. United States*, 273 U.S. 28, 33 (1927) (recognizing the "right of the federal government to avail itself of evidence improperly seized by state officers operating entirely upon their own account," but holding that, where the federal government itself "participates in the wrongful search and seizure," the improperly seized evidence is excludable in federal court), *abrogated by Elkins v. United States*, 364 U.S. 206, 223 (1960) (holding that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated . . . the Fourth Amendment is inadmissible" in federal court).

the arresting officers removed them from Lustig's pockets "with the view to [their] use in [the] federal [counterfeiting] prosecution." *Id.* at 77.

While accepting that the federal agent "was not the moving force of the search," the Court emphasized that a "[s]earch is not completed until effective appropriation, as part of an uninterrupted transaction, is made of illicitly obtained objects for subsequent proof of an offense." *Id.* at 78. As such, the federal agent's arrival at the hotel room after the search began and "selection of the evidence deemed important for use in a federal prosecution . . . , as part of the entire transaction in Room 402, was not severable, and therefore was part of the search carried out in that room." *Id.* In other words, the federal agent "share[d] in the critical examination of the uncovered articles as the physical search proceeded." *Id.* The Court refused to "differentiate between participation from the beginning of an illegal search and joining it before it had run its course." *Id.*

Here, however, law enforcement became involved only after L.S. discovered the SD card and its contents and asked J.T. to call Deputy Scott on her behalf. Farrar presents no evidence that Deputy Scott arrived at the East Meany house while L.S. pulled SD cards from the coin pouch and inserted them one-by-one into her phone. Indeed, L.S. testified that she put all the SD card back together nearly an hour before she asked J.T. to make the initial phone call to Deputy Scott on August 7, 2019. For his part, Deputy Scott testified that when he met with L.S.

three days after he received J.T.'s phone call, L.S. explained to him that she had been searching for her own photos when she discovered images and a video that she believed to depict child pornography. (*See also* Doc. 33-10 at 2.) In other words, unlike the federal agent in *Lustig*, Deputy Scott did not "critical[ly] examin[e]" the SD cards as L.S.'s physical search of the safe and the coin pouch proceeded. *See Lustig*, 338 U.S. at 78. Instead, he arrived after the purportedly illegal search had "run its course." *See id.*

That Deputy Scott instructed L.S. to preserve the property inside Farrar's bedroom until he could contact an outside agency for assistance does not change the Court's view that L.S. completed her search prior to government involvement. Farrar points to no authority, and the Court is aware of none, to suggest that when law enforcement asks a discovering witness to refrain from destroying potential evidence, the witness' prior conduct retroactively becomes a search for Fourth Amendment purposes. Instead, the Court agrees with the government's position that this type of directive is "standard law enforcement protocol" when a witness discovers evidence of criminal activity. (*See* Doc. 33 at 14.)

Additionally, despite the "infer[ences]" in his brief indicating otherwise, Farrar failed to elicit any evidence at the hearing that L.S. maintained a "pre-existing informant-type relationship" with Sanders County law enforcement. (*See* Doc. 30 at 14–15.) Deputy Scott testified that he never asked L.S. to act as a

confidential informant or source, and he had no knowledge of anyone else at the Sanders County Sheriff's office ever speaking with her at all. He went on to explain that, while he indeed relayed a tip to Idaho authorities in 2018 that Farrar was making a "drug run" through the state, neither L.S. nor J.T. was the original tipster. Agent Langley, too, confirmed that L.S. had never worked for HSI as a confidential informant. Finally, L.S. testified that neither state nor federal authorities asked her to search any of Farrar's property.

In sum, the Court finds that Farrar has not proven by a preponderance of the evidence that the government knew of, acquiesced in, or was otherwise involved in L.S.'s search of the safe and coin pouch, as required under the first prong of the *Cleaveland* inquiry. Instead, on the evidence presented, L.S. conducted the search unilaterally as a private citizen—conduct that the Fourth Amendment's protection does not reach. *See Jacobsen*, 466 U.S. at 113. Because this determination is dispositive, the Court need not decide whether L.S. searched Farrar's bedroom to assist law enforcement or to further her own ends. *See Sherwin*, 539 F.2d at 6.

## ORDER

For the foregoing reasons, IT IS ORDERED that Farrar's motion to suppress (Doc. 29) is DENIED.

DATED this 9th day of July, 2020.

                                                Dana L. Christensen, District Judge
                                                United States District Court